UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

LOCATEPLUS HOLDINGS                    )
CORPORATION,                          )
                                       )
    Plaintiffs,                    )
                                       )    CIVIL ACTION
                                       )
v.                                     )    FILE NO.  04-11705-RGS
                                       )
STEVE SILVA,                          )
                                       )
    Defendant.                     )
                                       )

### DEFENDANT STEVE SILVA'S BRIEF IN OPPOSITION TO PLAINTIFF LOCATEPLUS HOLDINGS CORPORATION'S MOTION FOR PRELIMINARY INJUNCTION

## I.    INTRODUCTION

Defendant Steve Silva hereby submits his Brief in Opposition to Plaintiff

LocatePlus Holdings Corporation's ("LocatePlus") Motion for Preliminary Injunction.

LocatePlus's Motion should be denied for six simple and equally compelling reasons: (1)

Silva never signed the agreement underlying this dispute; (2) LocatePlus is not likely to

succeed on the merits where the central issue (whether there is a written agreement

between the parties) is in dispute; (3) counsel for Plaintiff obtained a temporary

restraining order by intentionally misrepresenting that the agreement does prohibit

employment by a competitor; (4) the plain language of the agreement at issue does not

prohibit Silva from working for a competitor of LocatePlus; (5) Silva has not engaged in

any of the other activities LocatePlus seeks to enjoin; and (6) the agreement at issue is unenforceable under Massachusetts law.

## A.    Background

Silva is a former employee of LocatePlus. Silva worked for LocatePlus as its Vice President of Business Development from approximately January 28, 2002 until July 16, 2004. Although Silva was given some duties regarding sales, marketing, and data acquisition during his employment with LocatePlus, his primary duty at all times involved the development of potential partners for the company.

LocatePlus, along with at least four related companies, is engaged in the business of providing online investigative solutions to law enforcement, legal and insurance professionals, licensed investigators, and other related businesses. LocatePlus is one of a number of competing companies within this industry, and its emphasis to date has been on so-called "lower end" customers (often consisting of small companies, small law enforcement agencies, and individuals). LocatePlus is a Delaware corporation with its principal place of business in Beverly, Massachusetts. While he was working for LocatePlus, Silva maintained a residence in Marblehead, Massachusetts and he worked in the Beverly office.

Upon his resignation from LocatePlus, Silva now works as an Assistant Vice President-Channel Sales for ChoicePoint, Inc. ("ChoicePoint"). In his position with

ChoicePoint, Silva is responsible for finding other businesses who would like to distribute ChoicePoint's various products.

ChoicePoint is engaged in a business that admittedly has some overlap with LocatePlus's business, but is different in many important ways. Through the identification, retrieval, storage, analysis, and delivery of data, ChoicePoint serves the informational needs of businesses of all sizes, as well as federal, state, and local government agencies. ChoicePoint offers a wider array of services than LocatePlus. LocatePlus concentrates almost exclusively on small law enforcement and private investigation customers. In addition, unlike LocatePlus, ChoicePoint maintains a focus on the "higher end" of the market by soliciting large businesses and firms in a wider array of industries. ChoicePoint is a Georgia corporation with its principal place of business in Alpharetta, Georgia. While he worked for LocatePlus, Silva exclusively sold non-Fair Credit Report Act ("FCRA") products. (Silva Aff. at ¶ 10, attached hereto as Ex. A). In contrast, Silva now exclusively sells FCRA products for ChoicePoint. (Id. at ¶ 19).

Silva now resides in Alpharetta, Georgia at 2435 Hamptons Passage, and he works at ChoicePoint's Alpharetta, Georgia office. He, his wife and their two children moved from Massachusetts to Georgia in July upon his acceptance of a position with ChoicePoint.

LocatePlus claims that early in his employment Silva executed a document titled "LocatePlus.com Confidentiality and Non-Compete Agreement" ("Agreement", attached

hereto as Ex. B.)  LocatePlus, however, does not have an executed Agreement and falsely contends that Silva absconded with the only executed copy.

Silva denies that he ever executed any Agreement with LocatePlus regarding his post-employment activities.  (Silva Aff. at ¶ 8).  In fact, LocatePlus CEO and President Jon Latorella explicitly advised him to never sign a non-compete agreement early in his employment with LocatePlus.  (Id. at ¶ 7).  Silva further alleges that he advised Mark Whitney, outside counsel for LocatePlus, that he had never signed such an Agreement as recently as six months before his resignation.  (Id. at ¶ 9).  No one ever made an effort thereafter to request that he sign one.  (Id.).

Although LocatePlus admittedly does not have an executed Agreement, counsel for LocatePlus sent letters to Silva (at his Marblehead, Massachusetts address) and to ChoicePoint (at its Alpharetta, Georgia headquarters) on July 20, 2004 threatening to enforce the Agreement in Georgia.  In pertinent part, the July 20, 2004 letters to Silva and ChoicePoint stated that Silva is subject to the Agreement described above, that Silva must immediately cease and desist his employment with ChoicePoint and any activities he is conducting on ChoicePoint's behalf, and that LocatePlus intends to pursue any and all legal remedies available to it against both Silva and ChoicePoint.

**B.    Procedural History**

   1.    <u>Silva and LocatePlus File Similar Actions on the Same Day in the State</u>
<u>Courts of Georgia and Massachusetts</u>

Three days after LocatePlus sent the letters to Silva and ChoicePoint, similar

actions were filed in both the Superior Court of Fulton County, Georgia, and the Superior

Court of Suffolk County, Massachusetts.  On July 23, 2004, ChoicePoint and Silva filed a

Verified Complaint for Declaratory Judgment and Temporary Restraining Order in the

Fulton County Superior Court ("the Georgia Action").  On that same day, LocatePlus

filed a similar action in the Suffolk County Superior Court ("the Massachusetts Action")

seeking a preliminary injunction, but not a Temporary Restraining Order.

   2.    <u>Hearings Are Scheduled by the State Courts of Georgia and Massachusetts</u>

In the Georgia Action, Fulton County Superior Court Judge Charles L. Carnes

issued a Rule Nisi on July 26, 2004 ordering LocatePlus to appear at a hearing on Friday,

July 30, 2004, and to show cause why the Motion for a Temporary Restraining Order

should not be granted.  Counsel for Silva and ChoicePoint provided a copy of all

documents filed in the Fulton County Superior Court, including the Rule Nisi, to

LocatePlus and its counsel on Monday, July 26, 2004, four (4) days prior to the scheduled

hearing.  Meanwhile, the Suffolk County Superior Court in Massachusetts scheduled a

preliminary injunction hearing for August 4, 2004 (the week after the scheduled

Temporary Restraining Order hearing in Georgia).

3. LocatePlus Obtains an Illegal *Ex Parte* Temporary Restraining Order without Even Attempting to Provide Notice to Silva's Counsel and Misrepresents that the Agreement Contains a Non-Competition Covenant

On Thursday, July 29, 2004, the eve of the Temporary Restraining Order hearing before the Georgia court, LocatePlus filed for and received an *ex parte* Temporary Restraining Order from the Massachusetts court enjoining Silva "from prosecuting a separate suit in any other court, including, but not limited to, the state and federal courts of Georgia, that arises from or involves the same nucleus of facts, controversy, and/or issues raised in the instant suit or that would otherwise interfere with this action." The Order applied to "Defendant Silva" and his "attorneys, agents, or any other individual or entity within his control."

LocatePlus sought and received this *ex parte* TRO in Massachusetts without providing (or even attempting to provide) notice to counsel for Silva and/or ChoicePoint. This failure was inexcusable, as counsel for LocatePlus had known about the Georgia proceeding and of the identity of Silva's and ChoicePoint's counsel three (3) days earlier. In addition, counsel for LocatePlus had spoken to Silva's and ChoicePoint's counsel on Wednesday afternoon, the day before he moved for the *ex parte* Order, and he made no mention of his intentions at that time. Moreover, under Rule 65 of the Massachusetts Rules of Civil Procedure, an *ex parte* TRO may be granted without written or oral notice to the adverse party or his attorney "only if it clearly appears from specific facts shown by affidavit or by the verified complaint that immediate and irreparable injury, loss or

damage will result to the applicant before the adverse party or his attorney can be heard in opposition." LocatePlus did not make this showing (or even attempt to make this showing). Even worse, LocatePlus falsely alleged that the form agreement which it contended Silva signed contained a prohibition against mere employment with a competitor.

The Massachusetts state court's TRO was on its face illegal, invalid, and contrary to the well-settled law of the United States Supreme Court. Indeed, in <u>Donovan, et al. v. City of Dallas, et al.</u>, 377 U.S. 408, 412-13, 84 S. Ct. 1579, 1582 (1964), the United States Supreme Court held that Congress "has in no way relaxed the old and well-established judicially declared rule that state courts are completely without power to restrain federal-court proceedings in *in personam* actions like the one here. And it does not matter that the prohibition here was addressed to the parties rather than to the federal court itself." <u>See also</u> Wright & Miller, Federal Practice and Procedure, § 4212 (stating "it has been clear since 1964 that a state court is completely without power to restrain federal proceedings in actions in personam" (citing <u>Donovan</u>)). Of course, when the Massachusetts state court TRO was entered, the federal court in Georgia had jurisdiction of the parties' dispute due to LocatePlus's removal of the Georgia state court action to the

United States District Court for the Northern District of Georgia on July 29, 2004. Thus, *ab initio*, the Massachusetts state court's TRO was invalid and unenforceable.[1]

4.    The United States District Court for the Northern District of Georgia Schedules a Hearing for August 6, 2004

On July 30, 2004, the United States District Court for the Northern District of Georgia entered an Order in which it denied Silva's and ChoicePoint's Motion for Temporary Restraining Order (which had been filed with the Fulton County Superior Court). The Court directed the parties to appear for a preliminary injunction hearing at 10 a.m. on Friday, August 6, 2004. The court further directed the parties to submit a list of exhibits and witnesses, proposed findings of fact, and proposed conclusions of law no later than August 4, 2004.

On Monday, August 2, 2004, Silva removed this case to this Court. That same day, ChoicePoint (which was not a party to the Massachusetts case or TRO entered by the state court there) filed a Motion for Order Protecting the Jurisdiction of the Georgia District Court and Memorandum of Law in Support in the Georgia Action. Via this Motion, ChoicePoint asked the Court to enjoin LocatePlus from proceeding in the Massachusetts federal action. The Court denied ChoicePoint's Motion and advised the

---

[1] When this Court entered its August 3, 2004 Order setting a preliminary injunction hearing for August 9, the Court undoubtedly extended the state court TRO as part of its August 3 Order without knowledge that the state court TRO was unlawful, invalid and contrary to the law.

parties that any and all jurisdiction issues would be addressed by the Court at the August 6 preliminary injunction hearing.

5.   This Court Extends the TRO Entered by the Massachusetts Superior Court and Schedules a Hearing for August 9, 2004

As noted above, while ChoicePoint's Motion was pending, on August 3, 2004, this Court entered an Order setting a preliminary injunction hearing in Massachusetts for August 9, 2004. The Order states that the "Temporary Restraining Order issued by the [Massachusetts] Superior Court will remain in effect until the parties are heard by this court." As was the case with the original TRO entered by the Massachusetts Superior Court, this Order came without notice to counsel for Silva and ChoicePoint and it was entered without any opportunity for Silva's and ChoicePoint's counsel to be heard. It appears that this Court was not even aware of the Georgia Action when it entered this Order or that the Massachusetts state court Order was invalid and unenforceable under Donovan.

6.   LocatePlus Moves to Dismiss, Transfer, or Stay the Georgia Action

Also on August 3, 2004, LocatePlus filed an Emergency Motion to Dismiss, Transfer Venue, and/or Stay Proceedings and Request for Telephonic Hearing, as well as a memorandum in support, in the Georgia Action. In essence, LocatePlus moved the Court to dismiss the Georgia Action, transfer the case to this Court, or stay the proceeding in favor of the Massachusetts action. As of the close of business on

Thursday, August 5, the Georgia District Court had not ruled on this Motion, and the

preliminary injunction hearing was still scheduled for 10:00 a.m. on August 6.

## C.    The Agreement at Issue

The relevant provisions of the Agreement are contained in Paragraphs 1, 2, and 5

of the document, which state:

1. During the period of employment with the Company and after any separation from LocatePlus.com, Inc., the Employee agrees not to disclose or use in any way adverse to the Company, or assist in the unauthorized disclosure or use of, any Proprietary Information. "Proprietary Information" shall mean all of the Company's confidential and proprietary information and trade secrets, including but not limited to, the following: computer software codes, programs and data bases or other computer technology; all processes and formulae utilized by the Company; customer lists and any other lists or compilations of information; all Company plans and proposals, marketing and sales plans or financial information; any information regarding the Company's methods of doing business; any information of any third party in the possession of the Company with respect to which the Company or any of its affiliates are subject to duties of nondisclosure or restrictions on use; any works of authorship, concepts or ideas related to the business of the Company, whether created by the Employee or by others.

2. During the period of employment with the Company and after any separation from LocatePlus.com, Inc., the Employee agrees not to use for his or her own benefit or purpose any Proprietary Information. At the date of termination of employment with the Company, the Employee will promptly return to the Company all originals and copies of any Proprietary Information (in whatever form embodied) which he or she may have in his or her possession.

. . .

> 5. During any employment and for a period of one year
>    following the cessation of employment, the Employee
>    agrees that he or she shall not, either directly or indirectly,
>    solicit or entice any employee or consultant of the Company
>    to leave the Company or work for anyone in competition
>    with the Company or solicit, entice or in any way divert any
>    customer or supplier to do business with any business or
>    entity in competition with the Company.[2]

(See Agreement).

The Agreement contains three types of restrictive covenants: non-disclosure, non-recruitment of LocatePlus employees, and non-solicitation of LocatePlus customers. The Agreement does not purport to prohibit Silva from working for a competitor.

The non-disclosure covenant contained in the Agreement applies to all "proprietary information" (a phrase that is defined at length in Paragraph 1 of the Agreement) and purports to cover information which could, in part, be available in the public domain. There is no time limit on Silva's duty of non-disclosure.

The non-recruitment covenant contained in the Agreement prohibits Silva from recruiting employees of LocatePlus to leave LocatePlus or work for anyone in competition with the Company. The non-recruitment covenant purports to cover all

---

[2] In its Complaint, LocatePlus misrepresented that this paragraph states that employees agree "for a period of one year ... *not* [...] *to* [...] *work for anyone in competition with the Company* or solicit, entice or in any way divert any customer or supplier to do business with any business or entity in competition with the Company." (Complaint at ¶ 10) (emphasis added; ellipsis in brackets added, not found in Verified Complaint).

LocatePlus employees irrespective of whether Silva had material contact with them while employed at Locate Plus. There is no geographic restriction on this covenant.

The non-solicitation of customers covenant contained in the Agreement also lacks any geographic restrictions. It purports to limit Silva's solicitation of business as to all of LocatePlus' customers, irrespective of whether Silva ever had contact with them for a business purpose on behalf of LocatePlus. If enforced, it would further prohibit Silva from soliciting business from customers of LocatePlus for products which are not in competition with LocatePlus, simply because his new employer offers other products which are in competition with the products of LocatePlus.

## II.    ARGUMENT AND CITATION OF AUTHORITY

### A.    LocatePlus's Request for Injunctive Relief is Premised on a Document that Does not Exist

The fundamental premise of LocatePlus's Motion for Preliminary Injunction is illusory because it is based on a document that does not exist -- Silva <u>never</u> signed the so-called Agreement. (Silva Aff. at ¶ 8). In fact, LocatePlus CEO and President Jon Latorella explicitly advised Silva never to sign a non-compete agreement early in his employment with LocatePlus. (<u>Id.</u> at ¶ 7). Furthermore, Silva told Mark Whitney, outside counsel for LocatePlus, that he had never signed such an Agreement as recently as six months before his resignation. (<u>Id.</u> at ¶ 9).

Because Silva never signed the Agreement, LocatePlus resorts to alleging that Silva absconded with the Agreement. (Complaint at ¶ 11). This allegation is completely

00017347.DOC

false. Silva never took his personnel file or any document in his file from Paula Reed's office. (Silva Aff. at ¶ 21). Rather, Silva merely borrowed (and returned) a subordinate employee's personnel file to prepare a performance review of that employee. (Id.). Thus, the very foundation of LocatePlus's request for an injunction is non-existent.

**B.    LocatePlus Cannot Possibly Demonstrate a Likelihood of Success on the Merits Where the Central Issue Is in Dispute**

In deciding whether to grant a preliminary injunction, a district court must weigh the following four factors: "(1) the likelihood of the movant's success on the merits; (2) the potential for irreparable harm to the movant; (3) a balancing of the relevant equities, *i.e.,* the hardship to the nonmovant if the restrainer issues as contrasted with the hardship to the movant if interim relief is withheld; and (4) the effect on the public interest of a grant or denial of the injunction. Gately v. Commonwealth of Massachusetts, 2 F.3d 1221, 1224 (1st Cir. 1993).

The most significant of these four factors, however, is whether the movant is likely to succeed on the merits. See id. (the "*sine qua non* of [the preliminary injunction standard] is whether the plaintiffs are likely to succeed on the merits"); United Steelworkers of America v. Textron, Inc., 836 F.2d 6, 7 (1st Cir. 1987) ("[t]he heart of the matter is whether the harm caused plaintiff without the injunction, *in light of* the plaintiff's likelihood of eventual success on the merits, outweighs the harm the injunction will cause defendants") (quoting Vargas-Figueroa v. Saldana, 826 F.2d 160, 162 (1st Cir. 1987) (emphasis in original)).

Here, LocatePlus is not entitled to injunctive relief because it is impossible for LocatePlus to establish that it is likely to succeed on the merits. Silva has testified that he never signed the Agreement. (Silva Aff. at ¶ 8). In contrast, Ms. Reed has testified that Silva did, in fact, sign the Agreement. (Reed Aff. at ¶ 8). Accordingly, LocatePlus cannot possibly demonstrate that it is likely to succeed on the merits when the central issue in this case -- whether Silva signed the Agreement -- is vehemently disputed. See Geas v. Dubois, 868 F. Supp. 19, 25 (D. Mass 1994) ("[p]laintiff's motion for a preliminary injunction is unavailing ... [T]he crucial facts necessary to establish plaintiff's claims are in dispute. Accordingly, plaintiff fails to show a reasonable likelihood of success on the merits"); Spencer Companies, Inc. v. Armonk Indus., Inc., 489 F.2d 704, 707 (1st Cir. 1973) (affirming denial of motion for preliminary injunction because of uncertainty that movant "would ever prevail on the merits" in light of a "major factual dispute").

In fact, the United States District Court for the Southern District of New York has denied a motion for preliminary injunction under virtually identical circumstances to those present in the instant case. See Geritrex Corp. v. Dermarite Indus., LLC, 910 F. Supp. 955 (S.D.N.Y. 1996). In Geritrex, the plaintiff requested a preliminary injunction prohibiting the defendants from competing with the plaintiff for six months on the ground that the defendants had signed

confidentiality and non-competition agreements during their employment with the plaintiff. Id. at 959. In support of the plaintiff's claim that the defendants had indeed signed these agreements, an employee of the plaintiff testified that he actually saw a copy of a signed agreement and that he believed one of the defendants had removed the agreement at issue from his personnel file. Id. at 960. Both of the defendants testified, however, that they never signed the agreements. As a result, the Court held that the plaintiff had not demonstrated a likelihood of success on the merits because "there appears to be a close factual question concerning whether [the defendants] signed an agreement." Id. at 961. The Court reasoned that the plaintiff's claim was "based on the hotly disputed premise that [the defendant] signed an agreement. *We will not issue a preliminary injunction on such a dubious basis*." Id. at 965. (emphasis added).

Like the defendants in Geritrex, Silva has adamantly denied that he ever signed the Agreement that underlies this dispute. Accordingly, it would be incongruous to find that LocatePlus is "likely" to succeed in demonstrating that the Agreement restricts Silva from working for ChoicePoint when it cannot even establish that the Agreement exists. See Gately, 2 F.3d at 1224.

{00017347.DOC} - 15 -

**C.    The Plain Language of the Agreement Does Not Prohibit LocatePlus's Former Employees from Working for a Competitor**

1.    LocatePlus Has Intentionally Misrepresented that the Agreement Contains a Non-Competition Covenant

Even if Silva had signed the Agreement (which he did not), Silva would not be restricted from working for ChoicePoint because the plain language of the Agreement does not prohibit employees from working for a competitor. Although the Agreement is titled, "Confidentiality and Non-Compete Agreement," the Agreement clearly does not contain a non-competition covenant.[3] (See generally Ex. B).

In a desperate attempt to mislead the Court into believing that the Agreement contains a non-competition covenant, LocatePlus blatantly misquotes the most significant portion of the Agreement. In its Complaint, LocatePlus represents that the Agreement states that employees agree

> for a period of one year ... *not* [...] *to* [...] *work for anyone in competition with the Company* or solicit, entice or in any way divert any customer or supplier to do business with any business or entity in competition with the Company.

(Complaint at ¶ 10). (emphasis added; ellipsis in brackets added, not found in Verified Complaint). Nothing even remotely similar to this italicized phrase

---

[3] As discussed above, the Agreement contains the following three restrictive covenants -- non-disclosure (paragraphs 1 and 2), non-recruitment (the first half of paragraph 5), and non-solicitation of customers (the second half of paragraph 5).

appears anywhere in the Agreement -- it was conveniently fabricated by

LocatePlus. In actuality, the Agreement merely states:

> for a period of one year following the cessation of employment, the Employee agrees that he or she shall not, either directly or indirectly, solicit or entice any employee or consultant of the Company to leave the Company or work for anyone in competition with the Company or solicit, entice or in any way divert any customer or supplier to do business with any business or entity in competition with the Company.

(Ex. B at ¶ 5).

Thus, a plain reading of the Agreement demonstrates that it does <u>not</u> prohibit

employees from working for a business that is in competition with the LocatePlus.

Rather, Paragraph 5 of the Agreement simply restricts employees from enticing an

employee to work for anyone in competition with LocatePlus and enticing any

customer to do business with a business in competition with LocatePlus. (<u>Id.</u>)

Therefore, there is no basis for enjoining Silva "from directly or indirectly working

for any business that engages in competition with LocatePlus Holdings

Corporation and its subsidiaries and affiliates, including but not limited to Choice

Point Inc. [sic]."[4] (<u>See</u> Complaint, Prayer for Relief).

---

[4] Even if paragraph 5 could be read to contain a non-competition covenant (which it cannot), any such ambiguity would be construed against LocatePlus, the drafter of the Agreement. <u>See Canam Steel Corp. v. Bowdoin Construction Co.</u>, 34 Mass. App. Ct. 943, 944 (1993).

2. Silva Has Not Engaged in Any of the Other Activities that
LocatePlus Seeks to Enjoin

There is also no basis for granting LocatePlus's requests to enjoin Silva from
(i) divulging LocatePlus's confidential information, (ii) enticing LocatePlus's
customers to do business with any entity in competition with LocatePlus, and (iii)
inducing LocatePlus employees from terminating their relationship with
LocatePlus, because LocatePlus has presented absolutely no evidence that Silva
has engaged in any such conduct or intends to engage in such conduct.
(Complaint, Prayer for Relief). LocatePlus has only alleged that Silva "visited one
of LocatePlus's new customers ... as a representative of ChoicePoint." (Complaint
at ¶ 25; Gupta Aff. at ¶ 3). LocatePlus, of course, did not tell the Court that Silva
was meeting with this customer to talk about a ChoicePoint product that
LocatePlus does not even sell. (Silva Aff. at ¶¶ 10, 19). In any event, LocatePlus's
allegation falls far short of demonstrating that Silva has engaged in any of the
conduct LocatePlus seeks to enjoin. Accordingly, LocatePlus's Motion for
Preliminary Injunction should be denied for the additional reason that Silva has not
engaged in any conduct that violates the terms of the Agreement.

**D.    The Agreement is Unenforceable Under Massachusetts Law**

Even if Silva had signed the Agreement and even if it actually contained a
non-competition covenant, the Agreement is unenforceable because it does not
contain any geographic restriction and it is not necessary to protect LocatePlus's

legitimate interests. A restrictive covenant between an employer and an employee may be enforced where the employer can show that the agreement is: (1) necessary to protect a legitimate business interest of the employer; (2) supported by consideration; (3) reasonably limited in all circumstances including time and space; and (4) otherwise consonant with public policy." Cypress Group, Inc. v. Stride & Associates, Inc., Civ. Action No. 03-6070-BLS2, 2004 Mass. Super. Lexis 69, *6 (Feb. 11, 2004).

"A restrictive covenant that protects an employer from ordinary competition, however, does not serve a legitimate business interest." Id. Furthermore, "[c]ontracts drafted by employers to limit the employment prospects of former employees -- even those at a very high level -- must be construed narrowly against the employer." Veridiem, Inc. v. Phelan, Civ. Action No. 034418BLS, 2003 WL 2281390, *3 (Mass. Super. Sept. 26, 2003). "A restrictive covenant will only be enforced if it is reasonable based on all of the circumstances." Id. at *10.

Here, the Agreement contains no geographic limitation -- it broadly purports to prohibit LocatePlus's former employees from performing certain activities in any area, regardless of whether LocatePlus even does business in that territory. Therefore, the Agreement is unreasonable in its geographic scope. See Cypress Group, 2004 Mass. Super. Lexis 69, *11 (denying request for preliminary injunction where territorial restriction was "completely arbitrary"); Abramson v.

Blackman, 340 Mass. 714, 716 (1960) (declining to enforce non-competition agreement that was unlimited as to territory and time).

Furthermore, the Agreement is not necessary to protect any legitimate business interest of LocatePlus. Cypress Group, 2004 Mass. Super. Lexis 69, *6. Silva is currently selling FCRA products exclusively. (Silva Aff. at ¶ 19). LocatePlus does not even offer FCRA products. (Silva Aff. at ¶ 10). Therefore, Silva is not in a position to harm LocatePlus's customer goodwill. Danieli & O'Keefe Associates, Inc. v. Braverman, Civ. Action No. 93-06532, 1994 Mass. Super. Lexis 247, *10 (Jan. 20, 1994) ("[a]ny restraint [on competition] must be consistent with the protection of the goodwill of the employer. The former employee must be in a position where he can harm that goodwill"). Accordingly, the Agreement is unenforceable as a matter of law.

### III.   CONCLUSION

For all of the foregoing reasons, Silva respectfully requests that the Court enter an Order denying LocatePlus's Motion for Preliminary Injunction.

This _6th_ day of August, 2004.

Mary Winstanley O'Connor, Esq.
(BBO # 541708)
Michelle A. Bernstein, Esq.
(BBO #637884)
Gaffin, Krattenmaker & O'Connor P.C.
2400 Prudential Tower
800 Boylston Street
Boston, Massachusetts 02199
(617) 437-6530


Stephen W. Riddell
Georgia Bar No. 604810
Jeffery E. Robertson
Georgia Bar No. 609739
TROUTMAN SANDERS LLP
5200 Bank of America Plaza
600 Peachtree Street N.E.
Atlanta, Georgia 30308-2216
Phone:  (404) 885-3000
Fax:  (404) 962-6515

Attorneys for Defendant Steve Silva